# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KIRK A. HANSON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-84 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

## I.  INTRODUCTION

Kirk A. Hanson ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* and § 1381 *et seq*.  Plaintiff filed his applications on May 2, 2008 alleging disability since July 6, 2004, which was later amended to an onset date of January 28, 2008, due to a seizure disorder (AR 38; 82; 149-158).[1]  His applications were denied (AR 82-90), and following a hearing held on February 18, 2010 (AR 29-78), the administrative law judge ("ALJ") issued his decision denying benefits on April 23, 2010 (AR 17-24).

Plaintiff's request for review by the Appeals Council was subsequently denied (AR 1-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g).  The instant action challenges the ALJ's decision.  Presently pending before the Court are the parties' cross-motions for summary judgment.  For the following reasons, both motions will be denied and the matter will be remanded to the Commissioner for further proceedings.

---

[1] References to the administrative record [ECF No. 7], will be designated by the citation "(AR ___)".

1

## II. BACKGROUND

Plaintiff was 47 years old on the date of the ALJ's decision (AR 22). He has a high school education and past work experience as a laborer, gas station attendant and set-up technician (AR 22). Plaintiff claims disability on the basis of a seizure disorder, and it is undisputed that the relevant time period with respect to that determination is from January 28, 2008, Plaintiff's amended onset date, through April 23, 2010, the date of the ALJ's decision.[2]

*A. Medical evidence submitted to the ALJ*

Plaintiff began treating with Jeffrey Esper, D.O., a neurologist, in November 2005 (AR 298). On February 6, 2008, Plaintiff complained of seizures and reported that he felt it was unsafe to work at the gas station (AR 311; 416). Dr. Esper advised him that if he felt unsafe he should avoid that type of work (AR 311). On February 11, 2008, Plaintiff complained of dizziness from his medication (AR 311). On February 28, 2008, Dr. Esper completed a form for the Domestic Relations Section in Warren County, Pennsylvania and reported that Plaintiff had "recurrent spells" that were "felt to be seizures" in the past (AR 297). He indicated that Plaintiff was not responding well to medications and suffered from side effects including dizziness (AR 297). Dr. Esper opined that Plaintiff had been "continuously disabled (unable to work)" from February 11, 2008 through May 26, 2008 (AR 297).

Plaintiff returned to Dr. Esper on April 16, 2008 and complained of dizziness while working in his yard (AR 312). When seen on June 3, 2008, Plaintiff reported that he had three seizures on January 28th and two seizures on January 29th (AR 313). He further reported that he lost consciousness and was disoriented for several hours (AR 313). Plaintiff stated that in March 2008 he woke up and his tongue was "chewed up" (AR 313). He indicated that he suffered from three to four seizures every six months (AR 313). He claimed he felt like a "zombie" and napped three to four hours a day (AR 313). Plaintiff further reported suffering from stress over losing his job (AR 313; 416). Dr. Esper increased his medication dosage (AR 313).

---

[2] Plaintiff filed a prior application for benefits on July 23, 2004 alleging disability since July 6, 2004 (AR 34-35). An administrative law judge denied this application in a decision dated January 8, 2007, and the Appeals Council denied review on December 20, 2007 (AR 35). Plaintiff did not appeal that determination. Plaintiff amended his alleged onset date to January 28, 2008 at the administrative hearing (AR 38).

On August 7, 2008, Plaintiff reported side effects due to the increased dosage of his medications (AR 314). He complained of lethargy, a decreased appetite and confusion (AR 314). He was instructed to split his dosage to decrease his symptoms (AR 314). At his September 2, 2008 office visit, Dr. Esper reported that Plaintiff complained of suffering from almost every side effect listed on the drug information sheet that was given to him by the pharmacy (AR 315; 412). Dr. Esper was of the view that there was a "strong likelihood" that Plaintiff's seizures were not "true epileptic seizures" but were pseudoseizures or stress induced (AR 416). He recommended that Plaintiff be evaluated at UPMC for a second opinion (AR 416). He further recommended that Plaintiff be weaned from his current medication and decreased his dosage amount (AR 315).

On September 4, 2008, Plaintiff underwent a consultative examination performed by Thomas Chesar, M.D. (AR 289-296). Plaintiff reported suffering from seizures following a 1981 motorcycle accident (AR 289). He indicated that his seizures occurred "less than six months in frequency" and that his last seizure occurred on August 27, 2008 (AR 289-290). Plaintiff also reported suffering from frequent headaches (AR 290). He claimed he suffered from six headaches per week, lasting a "couple of hours," with associated phonophobia and photophobia, and lightheadedness at times (AR 290). Plaintiff complained of intermittent dizziness, short term memory loss since age 25, balance problems, constant tinnitus, and blurred vision (AR 290-291). Plaintiff reported that he took Depakote, Keppra and Zonegran, but was being weaned off the Zonegran secondary to multiple side effects (AR 290). Plaintiff stated that he had trouble swallowing, had some urinary frequency, and suffered from drowsiness, which he attributed to the Zonegran (AR 291). Plaintiff reported that he walked and rode his bike "a lot" in order to increase his muscle strength (AR 291). He napped for one and a half to three hours during the day (AR 291).

Plaintiff's physical examination was unremarkable, except for some decreased hearing in his right ear (AR 291). Dr. Chesar diagnosed him with a seizure disorder and recommended that he continue to follow up with his neurologist (AR 292). Dr. Chesar completed a Medical Source Statement with respect to the Plaintiff's ability to perform work-related physical activities

3

(AR 295-296). He opined that Plaintiff had no limitations in lifting, carrying, standing, walking, sitting, and pushing or pulling (AR 295). He further opined that due to his seizure disorder, he would not recommend that the Plaintiff engage in balancing or climbing activities, and that he should not drive or work around heavy or moving machinery (AR 296).

On September 24, 2008, Dr. Esper referred Plaintiff to Gena Ghearing, M.D., at UPMC for evaluation (AR 316). Dr. Esper noted that Plaintiff continued to have "episodic spells" which the Plaintiff described as "seizures" (AR 316). He further noted that Plaintiff had been tried on a variety of medications, which either resulted in side effects or "persistent spells" (AR 316). Dr. Esper reported that Plaintiff had undergone several EEGs and a recent 24-hour ambulatory EEG, which were all normal (AR 316; 319; 331-332). He requested that Dr. Ghearing evaluate the Plaintiff and determine whether his "spells" were "worrisome for seizures" (AR 316).

On October 15, 2008, V. Rama Kumar, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could occasionally lift twenty pounds, frequently carry ten pounds, stand and/or walk for about six hours in an 8-hour workday, sit for about six hours in an 8-hour workday, and was unlimited in pushing and pulling activities (AR 279). He further found Plaintiff could occasionally climb, stoop and crouch, but never balance, kneel or crawl (AR 280). Dr. Kumar found that Plaintiff had no manipulative or visual limitations, but concluded nevertheless that he should avoid all exposure to hazards such as machinery and heights (AR 280-281). He noted that Plaintiff was able to care for his personal needs, perform routine household chores, and relate fairly well with others (AR 283). He further noted that Plaintiff had pursued aggressive treatment for his seizure disorder, and that treatment had been generally successful in controlling his symptoms (AR 283). Finally, he found that his assessment partially reflected certain aspects of Dr. Chesar's report (AR 284).

Plaintiff returned to Dr. Esper on December 16, 2008 and reported that he "never made it" to UPMC for evaluation (AR 317). Plaintiff reported having three seizures the week after his last office visit with corresponding falls, two mild episodes in October where he chewed his tongue, and three episodes in November, which consisted of a metal taste in his mouth, trouble

4

breathing, and sleep walking (AR 317). He further reported that he wet the bed and frequently had to get up at night to use the bathroom (AR 317). Dr. Esper was "strongly suspicious" that Plaintiff's "seizures" were not truly epileptic seizures but were stress induced (AR 416).

Plaintiff was also treated by Aruna Korlepara, M.D. beginning on January 29, 2009 (AR 402). On August 10, 2009, Plaintiff complained of seizures during sleep with bites on his tongue (AR 405). Plaintiff also reported suffering from panic attacks while in social gatherings or large crowds (AR 405). Physical examination revealed "old" bite marks on the right side of Plaintiff's tongue (AR 405). Dr. Korlepara instructed Plaintiff to refrain from driving, riding a bicycle or lawnmower, noting that his seizures were "uncontrolled" even with medications (AR 405). She was of the opinion that his panic attacks were a social anxiety disorder, and recommended counseling before she prescribed medication (AR 405).

On August 27, 2009, Plaintiff was evaluated by Gena Ghearing, M.D., a neurologist from UPMC (AR 398-401). Plaintiff reported that he suffered from seizures about once a month, and that his longest seizure-free interval was "less than six months" (AR 398). He further reported that he had repeated tongue bites, as well as soft tissue injuries, resulting from his seizures (AR 398). Plaintiff indicated that his seizures increased due to heat, stress, sleep deprivation and pain (AR 398). Plaintiff described two episodes (in 2001 and 2004) of prolonged shaking and confusion lasting for three to four hours (AR 398-399). Dr. Ghearing noted that Plaintiff took Depakote without any adverse effects (AR 399). Plaintiff also took Keppra, which caused decreased appetite, tinnitus, and insomnia (AR 399). Plaintiff reported that his previous anticonvulsant medication (Zonegran) caused multiple side effects, including lethargy, decreased appetite, and confusion (AR 399). Physical examination revealed scarring over Plaintiff's lateral posterior tongue and some mild difficulties with tandem walking (AR 400). His remaining physical examination was unremarkable (AR 400).

Dr. Ghearing formed an impression that Plaintiff had, *inter alia*, medically intractable epilepsy, poorly defined; generalized tonic-clonic seizures and possible complex partial seizures; traumatic brain injury; adverse effects on anticonvulsant medications, including fatigue, cognitive difficulties, decreased appetite, and paresthesias; and a mild cognitive impairment (AR

5

400). She recommended that he undergo an MRI and a prolonged video EEG monitoring in the epilepsy unit, which would necessitate tapering and discontinuing his medications for the test (AR 400). She prescribed Tegretol and Plaintiff was instructed to keep a seizure diary (AR 400).

Plaintiff returned to Dr. Korlepara on October 30, 2009, who reported that Plaintiff's seizures seemed under control following Dr. Ghearing's changes in his medications (AR 406). She further reported that his anxiety attacks were under control, although he was not on any medication for them (AR 406).

In a letter dated November 27, 2009, Dr. Ghearing reported to Dr. Korlepara that Plaintiff had been seen by her on November 24, 2009, and for reasons that were unclear, he had stopped taking the Depakote for quite some time, even prior to his admission to the epilepsy monitoring unit (AR 409). She indicated that Plaintiff reported that his current medication regimen was controlling his seizures and he denied any adverse side effects (AR 409). Dr. Ghearing stated that Plaintiff was admitted to the epilepsy monitoring unit from September 21, 2009 through September 25, 2009, and during this admission he had two complex partial seizures and one electrographic seizure (AR 409). Dr. Ghearing noted that since Plaintiff's last visit, he had three further episodes "worrisome" for generalized tonic-clonic seizures that were associated with tongue biting and urinary incontinence (AR 409). Plaintiff indicated to her that there was a causal relationship, in his view, between these past episodes and stress, heat and fatigue (AR 409).

Dr. Ghearing reported that Plaintiff's neuropsychiatric testing revealed that he had an average to low-average IQ, with comparable verbal and performance scores (AR 409). She found that testing overall was suggestive of bilateral impairment with greater right hemispheric deficits (AR 409). She was also of the view that he likely had an anxiety disorder with panic attacks (AR 409). Dr. Ghearing formed an impression that Plaintiff had, *inter alia*, medically intractable localization-related epilepsy; complex partial and generalized tonic-clonic seizures; traumatic brain injury; and adverse effects from anticonvulsant medications, which included fatigue, cognitive difficulties, decreased appetite, and paresthesias 409-410). She also found that he had a mild cognitive impairment with an anxiety disorder and panic attacks (AR 409-410).

6

She recommended an MRI and discussed various treatment options for intractable epilepsy (AR 410). It was decided that Plaintiff was to continue with medication trials, and she increased his Tegretol dosage (AR 410).

An MRI of the Plaintiff's brain conducted on December 17, 2009 showed encephalomalacic changes within the left inferior frontal lobe and left anterior temporal pole (AR 411). Dr. Ghearing reported on January 1, 2010, that these changes to the left side of the Plaintiff's brain were probably related to his prior head injury, and could be the source of his seizures (AR 407).

Plaintiff returned to Dr. Ghearing on February 24, 2010 and reported that since his last visit he had at least two seizures on November 15, 2009 and January 29, 2010 (AR 412). He also complained of some continued memory problems, fatigue, weight gain, gait unsteadiness, tremors, generalized weakness, speech hesitancy, diarrhea, and sleep difficulties (AR 412). Plaintiff reported multiple side effects from Dilantin, including shortness of breath, blurred vision, difficulty sleeping, canker sores, joint pain and bad dreams (AR 412). On physical examination, Dr. Ghearing reported that Plaintiff appeared well with no evidence of anticonvulsant toxicity, and his gait was stable (AR 412). She diagnosed him with medically intractable localization-related epilepsy; complex partial and generalized tonic-clonic seizures; traumatic brain injury; adverse effects from anticonvulsant medications, including fatigue, cognitive difficulties, decreased appetite, paresthesias, blurred vision, shortness of breath, tremor and joint pain (AR 412). She also diagnosed him with a mild cognitive impairment and an anxiety disorder with panic attacks (AR 412). She started him on a new anticonvulsant medication, indicating that his Tegretol dosage would be tapered and then discontinued (AR 412-413).

*A. Medical evidence submitted to the Appeals Council*

Plaintiff was seen by Dr. Ghearing on April 27, 2010 and reported that he had a seizure on April 10, 2010 while napping (AR 419). Dr. Ghearing reported that overall, Plaintiff felt he was "doing much better" on his medications (AR 419). Plaintiff further reported that although he continued to have some problems with side effects, his symptoms had improved (AR 419).

7

Plaintiff complained of problems with fatigue and joint pain (AR 419). Plaintiff's physical examination was unremarkable and his diagnosis remained unchanged (AR 419-420). Dr. Ghearing increased his lacosamide dosage in order to achieve better seizure control (AR 420).

On October 27, 2010, Plaintiff was psychiatrically evaluated by Asha Prabhu, M.D., a psychiatrist from Corry Counseling Services (AR 421-422). Plaintiff presented with a chief complaint of "anger management" (AR 421). He reported that he suffered from seizures "once a month" (AR 421). Plaintiff claimed he was verbally aggressive, irritable, and had "a lot of stresses" (AR 421). He reportedly felt "helpless" and "hopeless" at times, and had mood swings and racing thoughts (AR 421). He denied any suicidal or homicidal thoughts (AR 421). On mental status examination, Dr. Prabhu found Plaintiff's mood was "a little tense and irritable" (AR 421). She found that his memory, abstract thinking, concentration, insight and judgment were all intact, and that he was of average intelligence (AR 421). She diagnosed him with a mood disorder secondary to his medical condition and alcohol abuse in remission, and assigned him a global assessment of functioning ("GAF") score of 50 to 55 (AR 422).[3] Plaintiff declined any medication and requested therapy (AR 422).

On October 14, 2011, Dr. Ghearing forwarded a handout to Plaintiff explaining various treatments for epilepsy besides medication (AR 426). On October 24, 2011, Dr. Ghearing completed a Pennsylvania Department of Public Welfare Employability Assessment Form and opined that Plaintiff was "now" permanently disabled, which precluded any gainful employment (AR 425). The portion of the Form requesting a diagnosis was left blank (AR 425). She checked that her assessment was based upon physical examination, review of the medical

---

[3]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 41 to 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id*. An individual with a GAF score of 51 to 60 may have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)" or "moderate difficulty in social, occupational, or school functioning (e.g., no friends, conflicts with peers or co-workers)." *Id*.

records, clinical history, and appropriate tests and diagnostic procedures (AR 425). On October 26, 2011, Dr. Ghearing reported that Plaintiff's blood work was normal (AR 427).

### C. Hearing testimony

Plaintiff and Joseph Kuhar, Jr., a vocational expert, testified at the hearing held by the ALJ on February 18, 2010 (AR 29-78; 113-116). Plaintiff acknowledged that his medical records referred to a possible social anxiety disorder, but he did not receive any mental health treatment or take any medication for it (AR 41). Plaintiff testified that he suffered from seizures that occurred "every other month" (AR 42). He described them as grand mal type seizures, where he lost consciousness, bit his tongue, and lost control of his bladder or bowels (AR 42). Plaintiff stated that he did not feel well for three to five days after suffering a seizure (AR 43). Plaintiff claimed that he had also fallen and injured himself while suffering a seizure but did not require emergency treatment (AR 49). Plaintiff testified that he did not seek hospital treatment after suffering a seizure but reported them to his physicians (AR 44). He indicated that fatigue, stress and heat were the three "main instigators" of his seizures (AR 43).

Plaintiff testified that his medications made him feel like a "zombie" and caused dizziness, memory loss, panic attacks, balance problems, and confusion (AR 50-51). Plaintiff also claimed to suffer from fatigue requiring him to nap on a daily basis (AR 55-56). He stated that his balance problems occurred on a daily basis and he was unable to stand for longer than ten minutes without "wobbling" (AR 51). He further claimed that memory problems affected his ability to follow directions (AR 52). Plaintiff indicated that he feared leaving his home due to the risk of having a seizure (AR 55). Plaintiff testified that he had not had a driver's license since July 2001, and no longer rode a bicycle or engaged in hunting (AR 40; 57-58).

The ALJ asked the vocational expert to assume an individual of the same age, education and work experience as the Plaintiff, who was capable of performing light work, that did not involve climbing or balancing on heights, working with dangerous machinery, operating motor vehicles, and handling sharp objects such as cutlery (AR 62). The vocational expert testified that such an individual could perform the light positions of an office cleaner, vehicle cleaner, and dietary aide (AR 62-63).

9

Following the hearing, the ALJ issued his decision denying benefits to the Plaintiff (AR 17-24) and his request for review by the Appeals Council was denied (AR 1-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). He subsequently filed this action.

### III. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 1097, 229 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

### IV. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A

person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) with 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that the Plaintiff met the disability insured status requirements of the Act through September 30, 2011 (AR 17). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition. *See* 20 C.F.R. §§ 404.1520; 416.920. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Here, the ALJ concluded that Plaintiff's seizure disorder was a severe impairment but determined at step three that he did not meet a listing (AR 19-20). The ALJ found that Plaintiff had the residual functional capacity to perform light work, except that he could not engage in climbing or balancing on heights, and must avoid dangerous machinery, operation of motor

vehicles, and sharp objects such as cutlery (AR 20). At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 23). The ALJ also determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not fully credible (AR 21). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

We must first determine whether the evidence submitted to the Appeals Council, but not considered by the ALJ, dictates a remand. When a claimant seeks to rely on evidence that was not before the ALJ, the district court may remand the case to the Commissioner if three requirements are met. *Matthews v. Apfel*, 239 F.3d 589, 593 (3rd Cir. 2001). First, the evidence must be "new," in the sense that it is not cumulative of pre-existing evidence on the record. *Matthews*, 239 F.3d at 593-94; *Szuback v. Sec. of Health and Human Servs.*, 745 F.2d 831, 833 (3rd Cir. 1984). Second, new evidence must also be "material," meaning that it is "relevant and probative" and there is a reasonable possibility that the new evidence would have changed the outcome of the ALJ's decision. *Id*. Moreover, implicit in the materiality requirement is that the new evidence "relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Id*. Finally, "good cause" must be shown for not submitting the evidence at an earlier time. *Matthews*, 239 F.3d at 595.

Plaintiff has failed to demonstrate a new evidence remand is warranted. While all of the records submitted to the Appeals Council are "new" in the sense that they post-date the ALJ's decision, these records are immaterial since they do not relate to the time period for which benefits were denied. *See e.g., Harkins v. Astrue*, 2011 WL 778403 at *1 n.1 (W.D.Pa. 2011) (holding that a new evidence remand was not warranted where records dated one month after ALJ's decision did not expressly relate back to the relevant period); *Range v. Astrue*, 2009 WL 3448746 at *8 (W.D.Pa. 2009) (records that post-date the ALJ's decision are immaterial since they do not relate to the time period for which benefits were denied); *Anderson v. Comm'r of Soc. Sec.*, 2008 WL 619209 at *12 (D.N.J. 2008) (claimant not entitled to remand where records were dated after ALJ's decision); *Wilson v. Halter*, 2001 WL 410542 (E.D.Pa. 2001) (medical

12

reports relating to period of time after that addressed in the hearing are immaterial to the ALJ's decision and therefore do not warrant remand), *aff'd*, 27 Fed. Appx. 136 (3d Cir. 2002). Dr. Prabhu's psychiatric evaluation dated October 2, 2010 occurred six months after the ALJ's decision, and Dr. Ghearing's opinion relative to the Plaintiff's disability is dated October 24, 2011, approximately one and one-half years after the ALJ's decision in this case.[4] In addition, the treatment note entry from Dr. Ghearing dated two days after the ALJ's decision is not material and is merely cumulative of the evidence that was before the ALJ. *See Szubak*, 745 F.2d at 833. Therefore, we direct our attention to Plaintiff's arguments relative to the evidence that was before the ALJ.

Plaintiff challenges the ALJ's residual functional capacity ("RFC") assessment. "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft*, 181 F.3d at 359 n.1); *see also* 20 C.F.R. §§ 404.1545(a); 416.945(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d at 121. The Plaintiff's primary contention is that the ALJ failed to adequately address medical evidence arguably supportive of his contention that the side effects from the medications he was taking for his seizure disorder were, in and of themselves, disabling.[5]

---

[4] The Commissioner's Brief erroneously argues that the ALJ considered and discussed Dr. Ghearing's disability opinion in his decision. [ECF No. 15] pp. 10-11. The ALJ's decision reveals that he considered and discussed Dr. Esper's opinion dated February 26, 2008, wherein he opined that Plaintiff was only temporarily disabled from February 2008 until May 2008 (AR 22; 297).

[5] Plaintiff also contends that the ALJ's RFC assessment is flawed since he failed to engage in a "function-by-function" assessment of his physical limitations as required by Social Security Ruling ("*SSR*") 96-8p. *See* [ECF No. 9] pp. 10-15. Under *SSR* 96-8p, the ALJ is to determine an individual's functional limitations and assess his work related activities on a function-by-function basis, including certain physical demands of work activity such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions. SSR 96-8p, 1996 WL 374184. Plaintiff argues that the ALJ's alleged failure to comply with this requirement is reversible error. Any failure to engage in a detailed function-by-function assessment does not *per se* constitute reversible error where the ALJ's decision reflects that he adequately evaluated the medical evidence and the RFC assessment is supported by substantial evidence. *See White v. Astrue*, 2012 WL 1555399 at \*9 (E.D.Pa. 2012) (citing cases and noting that courts have declined to remand cases on the basis that the ALJ failed to provide a written function-by-function analysis when the ALJ's RFC determination is supported by substantial evidence and includes a discussion of how

The ALJ summarized the Plaintiff's testimony with respect to his medication side effects (AR 21). He acknowledged that the Plaintiff testified that his medications caused memory loss, anxiety, balance problems, confusion, and that they made him feel like a "zombie," requiring him to nap frequently (AR 21). The ALJ concluded, however, that the office treatment notes did not corroborate his allegations (AR 21). The ALJ reasoned:

> … Although the claimant has alleged various side effects from the use of medications, the medical records, such as office treatment notes, do not corroborate those allegations. At his initial evaluation with a new neurologist in August 2009, the claimant did not report any severe side effects from his medication but mentioned some lethargy, decreased appetite, and confusion (Exhibit 18F/2). In October 2009, he told his primary care physician that his anticonvulsant medication[s] were working well and did not mention any side effects (Exhibit 19F/5). He also denied adverse side effects at a November 2009 exam with his neurologist (Exhibit 12F/2). However, in February 2010, he reported a host of side effects including shortness of breath, blurry vision, sleep problems, canker sores, joint pain, bad dreams, fatigue, unsteadiness, and memory problems (Exhibit 21F/5). The neurologist did not adjust his current medication dosages and, in fact, prescribed an addition[al] anticonvulsant which suggests that his medication side effects were not disabling. His prior neurologist noted that the claimant had complained of every side effect listed on the drug information sheet given to him by his pharmacist and continued to complain of these side effects months after he stopped taking the medication (Exhibit 22F/3). Additionally, the claimant was advised to stop using marijuana as it was likely that this was making it more difficult to control his seizures. The claimant also stopped taking prescribed medications without consulting his physician (Exhibits 21F/2, 22F).

(AR 21-22).

In evaluating a claim for benefits, the ALJ must consider all the evidence in the case. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). Where competent evidence supports a plaintiff's claims, the ALJ must adequately explain in the record his reasons for rejecting or

---

the record evidence supports the determination); *Galvin v. Comm'r of Soc. Sec.*, 2009 WL 2177216 at *9 (W.D.Pa. 2009) (rejecting the claimant's argument that the ALJ erred in failing to engage in a detailed function-by-function assessment where he adequately evaluated the medical evidence of record and gave specific reasons for either accepting or discounting the evidence). Here, however, in light of the fact that the ALJ failed to address all of the medical evidence arguably supportive of the Plaintiff's claimed limitations in assessing the RFC, appropriate consideration could not have been given to the Plaintiff's functional limitations.

discrediting competent evidence. *Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000). Without this type of explanation, "the reviewing court cannot tell if significant evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705-07 (3d Cir. 1981); *see also Plummer*, 186 F.3d at 429 (ALJ must give some reason for discounting the evidence he rejects).

Absent from the ALJ's discussion are the treatment note entries reflecting Plaintiff's ongoing complaints relative to side effects from his medication.[6] For example, on February 11, 2008, Plaintiff complained to Dr. Esper that he suffered from dizziness due to his medications (AR 311). On February 28, 2008, Dr. Esper reported to the Domestic Relations Section in Warren County, Pennsylvania that Plaintiff's medications caused dizziness (AR 297). On June 3, 2008, Plaintiff reported to Dr. Esper that he felt like a "zombie" and napped three to four hours a day (AR 313). On August 7, 2008, Plaintiff complained of lethargy, a decreased appetite and confusion following an increase in his medications (AR 314). Dr. Esper instructed him to split his dosage in order to decrease his symptoms (AR 314). When evaluated by Dr. Chesar on September 4, 2008, Plaintiff reported that he was being weaned off Zonegran due to multiple side effects (AR 290). Plaintiff stated that he had trouble swallowing, had some urinary frequency, suffered from drowsiness, and napped for one and a half to three hours a day (AR 291). Dr. Esper reported to Dr. Ghearing on September 24, 2008, that Plaintiff had been tried on a variety of medications, which either resulted in side effects or "persistent spells" (AR 316). On August 27, 2009, Dr. Ghearing formed an impression that Plaintiff was suffering from, *inter alia*, adverse effects on anticonvulsant medications, including fatigue, cognitive difficulties, decreased appetite and paresthesias (AR 400).

In sum, there is a documented history of Plaintiff's complaints about drug related side effects and efforts by his physicians to address them. On remand, the ALJ is directed to address this evidence consistent with *Cotter*.

---

[6] In Plaintiff's Brief, he cites to numerous medical records beginning in 1990 that he contends the ALJ ignored. [ECF No. 9] pp. 17-19. We find no *Cotter* violation with respect to these records however, since, as previously indicated, the relevant time period with respect to the current application for benefits is from January 28, 2008, Plaintiff's amended onset date, through April 23, 2010, the date of the ALJ's decision.

## V. CONCLUSION

For the reasons discussed above, both motions will be denied and the matter will be remanded to the Commissioner for further proceedings.[7] An appropriate Order follows.

---

[7] The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issue addressed in this Memorandum Opinion. *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 800-01 (3d Cir. 2010).

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KIRK A. HANSON, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 12-84 Erie |
| | ) |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

AND NOW, this 16th day of April, 2013, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [ECF. No. 8] is DENIED, and the Defendant's Motion for Summary Judgment [ECF No. 14] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is directed to mark the case closed.

                                              s/ Sean J. McLaughlin
                                                United States District Judge

cm:    All parties of record